IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 1:16-CR-049** |
| | : | |
| **v.** | : | |
| | : | |
| **EVAN LAWBAUGH** | : | **Judge Sylvia H. Rambo** |

### <u>M E M O R A N D U M</u>

Before the court is the Motion to Vacate, Set Aside or Correct a Sentence by a Person In Federal Custody Under 28 U.S.C. § 2255 (Doc. 78), filed by Defendant Evan Lawbaugh ("Defendant" or "Lawbaugh"). For the reasons outlined below, the court shall grant the motion in part and deny it in part.

### I. BACKGROUND

On March 2, 2016, the United States Attorney's Office for the Middle District of Pennsylvania filed an indictment against Lawbaugh accusing him of one count of violating 18 U.S.C. § 2251(a) by sexually exploiting a child for the purpose of recording and distributing a live recording of it. Two weeks later, the government filed a superseding indictment, adding two additional counts of sexual exploitation of a child, an additional count under 18 U.S.C. § 2252A(a)(2) and (b) for the distribution of child pornography, and an additional count under 18 U.S.C. § 2256(8)(A) for possession of child pornography, resulting in five total counts against Lawbaugh. Attorney Tom Thornton with the Middle District of Pennsylvania Federal Public Defender's Office was appointed to represent him.

1

After being appointed, Attorney Thornton began negotiating a plea agreement with the government. The government eventually provided a written offer including, *inter alia*, the following benefits for Lawbaugh: (1) the dismissal of all counts in the superseding indictment other than the two § 2251(a) counts; (2) no further prosecution for the facts underlying the superseding indictment; and (3) a recommendation from the government that Lawbaugh receive a three-level reduction in his offense level under the sentencing guidelines due to his acceptance of responsibility. In exchange, Lawbaugh agreed to, *inter alia*: (1) admit he did, in fact, sexually exploit children for the production of child pornography; (2) not withdraw his guilty plea if "the court imposes a sentence with which the defendant is dissatisfied;" and (3) waive "any and all possible grounds for appeal, whether constitutional or non-constitutional."

After receiving a written copy of this agreement, Attorney Thornton drove to the facility where Lawbaugh was held to discuss it with him. Attorney Thornton elected not to mail a physical copy of the plea agreement to Lawbaugh because he was concerned other prisoners might discover the charges against Lawbaugh and abuse him for them. The two met in a room with a glass separator and discussed the agreement by phone. Attorney Thornton pressed each page of the plea agreement up to the glass while he read it aloud, word-for-word, to Lawbaugh. He asked Lawbaugh if he understood each paragraph, including the appellate waiver.

2

Knowing that Lawbaugh was diagnosed with Asperger's, Attorney Thornton was careful to monitor Lawbaugh's responses so he could provide further explanation for any provisions Lawbaugh did not appear to understand. Attorney Thornton could not say for certain that Lawbaugh understood the appellate waiver. But—according to both Attorney Thornton and Lawbaugh—Thornton did his best to explain every aspect of the plea deal as thoroughly as possible. According to Attorney Thornton, if Lawbaugh had expressed any kind of misunderstanding or confusion during his explanation of the appellate waiver, he would have attempted to better explain it to him. Attorney Thornton also believed that, given the potentially "astronomical" sentence Lawbaugh was exposed to, the appellate waiver was an unimportant aspect of the plea deal. Combined with the fact that, in his experience, the government considered appellate waivers non-negotiable, Attorney Thornton did not bargain with the government over the removal of the waiver.

The plea agreement listed Lawbaugh's mandatory minimum sentence as fifteen years per count. If Lawbaugh had a clean criminal record, this would have been a correct statement. *See* 18 U.S.C. § 2251(c). But, in 2014, Lawbaugh pleaded guilty in state court to a sexual abuse of children offense. Having pleaded guilty to a prior child sex crime, § 2251(c) required his minimum sentence be twenty-five years in prison. *See id.* Attorney Thornton explained to Lawbaugh that the government had mistakenly written fifteen years as the minimum, but that, for now,

3

they should simply let it be, in the hopes the government might respect it. After hearing counsel's advice, Lawbaugh agreed to the plea, signed the plea agreement that day, and delivered it back to Thornton.

On April 13, 2017, the court held a hearing on Lawbaugh's change of plea. While Lawbaugh was present in court, the government introduced the plea agreement and noted that the fifteen-year statutory minimum listed in the agreement was incorrect and needed to be changed to twenty-five years. In addition to hearing this fact, Lawbaugh observed the edited plea agreement, discovering that the year "15" had been struck through, and the agreement now read that his minimum sentence was "25" years.

The court then began questioning Lawbaugh as to whether he understood and agreed to the plea deal. The court asked him if he understood that, *inter alia*, he faced up to one-hundred years in prison, and that he had waived his appellate rights. He said yes. When the court finally asked if Lawbaugh had any questions, he said no, but the court followed up by asking: "Are you sure? You seem to be hesitant there." (Doc. 81, 11:7-11.) Lawbaugh responded: "No, I'm just remembering. I went through it with my attorney and he explained everything along the way pretty clearly." (*Id.*, 11:12-14.) On this basis, the court accepted Lawbaugh's guilty plea.

At some point between Lawbaugh entering his guilty plea and the court sentencing him, Attorney Thornton and Lawbaugh discussed his possible sentences.

4

Attorney Thornton informed Lawbaugh and his family that he was optimistic that Lawbaugh would receive the mandatory minimum of twenty-five years, but he did not promise them any such sentence. He also advised them Lawbaugh could face a maximum statutory sentence of one hundred years. Lawbaugh informed Attorney Thornton that, if his sentence exceeded twenty-five years, he wanted to appeal it.

On January 3, 2018, the court held a hearing on Lawbaugh's sentence and heard, *inter alia*, testimony concerning a psychological evaluation conducted on Lawbaugh by Carol Weinman. During cross-examination of Ms. Weinman, Assistant United States Attorney Daryl Bloom began asking questions about a report issued by a separate expert, Dr. Dattilio, that neither party had introduced to the court for full examination. Attorney Thornton objected to its admissibility. The court granted the objection and stated that it would not take the Dattilio report into consideration in deciding Lawbaugh's sentence. At the conclusion of the hearing, the court sentenced Lawbaugh to forty years in prison—sixty years below the one-hundred-year statutory maximum recommended by both the government and the sentencing guidelines.

A few days after Lawbaugh was sentenced, his mother sent an email to Attorney Thornton asking him questions about the appellate process. Attorney Thornton responded by essentially telling her that Lawbaugh waived his right to take an appeal on any basis. Attorney Thornton did not travel to Lawbaugh's facility to

5

directly discuss the matter of appeals with him. Attorney Thornton thus permitted the fourteen-day appellate deadline to run without filing a notice of appeal.

One year after the court sentenced him, Lawbaugh filed a Motion to Vacate, Set Aside or Correct a Sentence by a Person In Federal Custody Under 28 U.S.C. § 2255 (Doc. 78), requesting that the court vacate his sentence, nullify his appellate waiver, and renew his appellate deadline, all based on various ineffective assistance of counsel arguments. The court subsequently entered an order to show cause, instructing the United States to respond. (Doc. 87.) The government filed a response (Doc. 92), and the court held a two-day evidentiary hearing on the matter. The issues are thus ripe for resolution.

## II. STANDARD OF REVIEW

The Sixth Amendment entitles those accused of crimes to counsel who will provide all services needed "to ensure that the trial is fair." *Strickland v. Washington*, 466 U.S. 668, 685 (1984). "A § 2255 motion is a proper and indeed the preferred vehicle for a federal prisoner to allege ineffective assistance of counsel." *United States v. Nahodil*, 36 F.3d 323, 326 (3d Cir. 1994). In evaluating an ineffective assistance of counsel claim brought under 28 U.S.C. § 2255, the court must examine two factors:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

6

> Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.... Unless a defendant makes both showings, it cannot be said that the conviction or ... sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*United States v. McKines-El*, No. 3:99-CR-035, 2005 WL 1215953, at *3 (M.D. Pa. Apr. 26, 2005) (quoting *Strickland*, 466 U.S. at 687).

In *Strickland*, the United States Supreme Court explained the proper method for analyzing each factor. First, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. It is easy, through hindsight bias, to unfairly scrutinize counsel's strategic and tactical decisions "after conviction or [an] adverse sentence"; to avoid this, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. For example, counsel does not have a duty to investigate every potential fact relevant to the case; instead, they must be free to place reasonable limits on the scopes of their investigations. *Id.* at 690-91. Second, regarding prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability is" less than a preponderance of the evidence—it is "a probability sufficient to undermine confidence in the outcome." *Id.*

## III.  DISCUSSION

Defendant raises several arguments that, if successful, would entitle him to three types of remedies: (1) vacating Lawbaugh's sentence and granting him a new sentencing hearing; (2) vacating Lawbaugh's sentence but then re-entering it to restart his appellate deadline; and (3) nullification of the appellate waiver. The court addresses each in turn.

### A. **Defendant Has Failed to Show His Counsel Performed Deficiently In Any Way That Negatively Impacted His Sentence.**

Defendant raises essentially five arguments that can be grouped under this header: (1) Attorney Thornton failed to research and introduce evidence of Lawbaugh being molested as a child; (2) Attorney Thornton failed to prepare Lawbaugh's family and ensure they could all testify at his sentencing; (3) Attorney Thornton failed to deliver Lawbaugh's letter to the court before his sentencing hearing; (4) Attorney Thornton failed to object to the alleged disparity in the court's sentence; and (5) Attorney Thornton failed to object to the introduction of an inadmissible expert report the government used at sentencing. The court will address each in turn.

Defendant's first argument is the one he most insistently pushes, specifically claiming that Attorney Thornton should have conducted an investigation into Lawbaugh's background to: (a) determine he had been molested as a child; and (b) introduce this evidence at the sentencing hearing. Defendant frames this point as a

8

"newly-discovered evidence" argument. This argument fails because Attorney Thornton did not act inappropriately in declining to investigate or present at sentencing Lawbaugh's allegation of molestation.

Attorney Thornton testified that, while he was representing Lawbaugh, Lawbaugh never volunteered to Thornton that he had been molested. During Lawbaugh's psychological evaluations, he did not tell the experts he had been molested. In contrast, Lawbaugh affirmatively swore to the probation office that he had *not* been molested. Furthermore, Attorney Thornton testified that, even had he known more, he would not have presented the evidence at the sentencing hearing because such evidence can be a double-edged sword; some judges will use that fact against the defendant. Thus, based on Attorney Thornton's professional experience and the facts before him, he made an informed decision to not investigate whether Lawbaugh had been molested. As such, his decision does not constitute inadequate representation of Lawbaugh.

Additionally, looking at the issue through the lens of newly-discovered evidence is also unhelpful to Lawbaugh. Axiomatically, Lawbaugh was aware of his experiences as a child at the time of his sentencing.[1] He simply chose not to disclose that information. Thus, it was not newly-discovered evidence. *See United*

---

[1] He has presented no evidence suggesting the memories were repressed and deep therapy was required to unearth them.

9

*States v. Cimera*, 459 F.3d 452, 460 n.10 (3d Cir. 2006) ("[W]here the defendant had possession of the evidence at the time of trial, his failure to realize its relevance will not render that evidence 'newly discovered.'"). Defendant argues he did not disclose this at the time of sentencing out of shame and fear. This may very well be true. Victims of abuse frequently do not publicly disclose their suffering for such reasons. But the fact that Defendant admits he was in possession of this evidence at the time of the sentencing hearing leaves him with no procedural mechanism for introducing it now.[2]

The second and third arguments raised by Lawbaugh may be valid critiques of Thornton's conduct, but they are insufficient to show ineffective assistance of counsel. Assuming Defendant is correct that, in an ideal situation, Attorney Thornton would have procured Lawbaugh's sister's testimony by video, the only testimony that he argues she would have introduced would have concerned Lawbaugh being molested—a fact that has already been addressed above. It is also unclear in what way Lawbaugh was prejudiced by his mother and other family members not being prepared to testify at his sentencing hearing. Thus, even if it

---

[2] Lawbaugh also argues there are several other facts that the court should have considered differently at sentencing, including evidence concerning impairment of his brain and how that affected his ability to understand what he was doing. The court has already considered all evidence presented at sentencing. Lawbaugh does not show any of the evidence he references was newly-discovered evidence that he was incapable of reasonably discovering and presenting at his sentencing hearing.

10

disadvantaged him slightly, it did not render the entire proceeding constitutionally unfair. Lawbaugh also complains that he wrote a letter that he wanted delivered to the court before the hearing, but, instead, he was forced to read it out loud—a method of delivery he believes is less persuasive. But Attorney Thornton testified that delivering the letter before the hearing would also have required him to deliver it to the government, who may then have crafted an opposition to it, ultimately damaging Lawbaugh's statement. As such, Attorney Thornton's strategic calculation merits deference, and the court declines to treat it as a dereliction of his duties as counsel.

Lawbaugh's fourth argument boils down to him citing four other cases where he believes similarly-situated defendants received lighter sentences. The only published case Defendant cites is starkly different from the facts here. *See United States v. Olhovsky*, 562 F.3d 530 (3d Cir. 2009) (defendant only pleaded guilty to possession of child pornography when he was a teenager, not the creation of child pornography as an adult through the molestation of children). Two of the other cases Defendant cites do not appear to involve any physical contact with children, just the taking of pictures or videos. *See United States v. Kelsin*, Case No. 4:CR-13-061 (M.D. Pa. filed Mar. 27, 2013); *United States v. Brooks*, Case No. 4:08-CR-455 (M.D. Pa. filed Dec. 11, 2008). And the only case involving contact with children resulted in Chief Judge Conner entering a sentence of thirty-five years, not a substantial difference from this court's forty-year sentence for Lawbaugh. *United*

11

*States v. O'Connor*, Case No. 1:12-CR-217 (M.D. Pa. filed Aug. 8, 2012). Thus, examining the facts that: (1) Lawbaugh engaged in repeated and extreme acts of molestation that he recorded and publicized; (2) he had a prior state conviction for similar acts before this court sentenced him; and (3) his forty-year sentence is still less than half of the statutory maximum the court could have given him, the court finds his sentence reasonable, even when examining the other cases cited by Lawbaugh.

Lawbaugh's fifth argument was already adequately addressed at the sentencing hearing. At sentencing, Attorney Thornton objected to the government using an inadmissible expert report, and—despite vigorous opposition by the government—the court granted the objection and stated it would not consider the report. Lawbaugh complains that Attorney Thornton should have objected earlier and perhaps later when the report was supposedly used again. But the court could not have granted Lawbaugh any additional remedy beyond agreeing not to consider it. The court thus will not entertain a new sentence on any of these bases.

**B. Lawbaugh's Appellate Waiver is Enforceable Because He Knowingly and Voluntarily Waived His Appellate Rights and Because The Appellate Waiver Was Irrelevant to His Decision to Sign the Plea Deal.**

A guilty plea is invalid for ineffective assistance of counsel if the movant shows: (1) counsel fell below a reasonable standard of care for attorneys practicing criminal law; and (2) it is reasonably probable that, but for counsel's ineffective

advice, the movant would have not pleaded guilty. *Nahodil*, 36 F.3d at 326 (citing *Hill v. Lockhart*, 474 U.S. 52, 56-59 (3d Cir. 1994)). "Section 2255 is a proper medium for raising challenges to the voluntariness of a guilty plea after the judgment of sentence has been imposed." *Id.* at 330. "The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill*, 474 U.S. at 56 (internal quotations omitted). "Where, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Id.* at 56 (internal quotations omitted). "In the context of a guilty plea, the prejudice prong of the test requires a showing 'that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *United States v. Fazio*, 795 F.3d 421, 426 (3d Cir. 2015) (quoting *Hill*, 474 U.S. at 59); *accord Jackson v. Superintendent Graterford SCI*, 721 F. App'x 128, 134 (3d Cir. 2018) ("Even assuming [the defendant's] plea was not knowing, voluntary, and intelligent when entered, [he] has not carried his burden of showing prejudice."); *Hill*, 474 U.S. at 60 ("Petitioner did not allege in his habeas petition that, had counsel correctly informed him about his parole eligibility date, he would have pleaded not

guilty and insisted on going to trial. . . . [and he did not] place[] particular emphasis on his parole eligibility in deciding whether or not to plead guilty.").

The Third Circuit has also specifically addressed the enforceability of appellate waivers within plea deals, crafting rules that closely track the general law governing the enforceability of a plea agreement. "[W]aivers of appeal, if entered into knowingly and voluntarily, are valid, unless they work a miscarriage of justice." *United States v. Shedrick*, 493 F.3d 292, 297 (3d Cir. 2007) (quoting *United States v. Khattak*, 273 F.3d 557, 563 (3d Cir. 2001)). "[I]neffective assistance of counsel qualifies as a miscarriage of justice sufficient to overcome a waiver-of-appeal provision." *Id.* at 298 n.6 (collecting cases).[3]

Here, there are two reasons Lawbaugh's challenge to his appellate waiver fails. First, there is ample evidence that he knowingly and voluntarily waived his right to appeal, and his testimony opposing this evidence is not credible. Lawbaugh admitted several times that Thornton read him every line of the plea deal containing the appellate waiver, including the waiver itself. He also showed Lawbaugh the

---

[3] The Third Circuit has never created an exhaustive list of circumstances under which a miscarriage of justice exists. *See United States v. Mitchell*, 538 F. App'x 201, 203 (3d Cir. 2013) (explaining that the Third Circuit has declined "to adopt a blanket rule" governing when appellate waivers are unenforceable) (quoting *Khattak*, 273 F.3d at 562). The court, however—in the first section of this memorandum—has already addressed all of Lawbaugh's arguments that could be alternatively characterized as reasons why his inability to appeal would constitute a miscarriage of justice. In finding that Lawbaugh's sentence—the issue he says he wants to appeal—is correct, the court has axiomatically also found no miscarriage of justice would occur if his appellate waiver was enforced.

14

appellate waiver so he could read it. Thornton also testified that he did his best to observe Lawbaugh while explaining things to him, re-explaining things when it appeared Lawbaugh did not understand them. Finally, during the plea colloquy, the court specifically asked Lawbaugh if he had read and agreed to the appellate waiver in the plea deal, and he testified yes. *See Khattak*, 273 F.3d at 563 (holding the district court properly determined the defendant knowingly and voluntarily signed the waiver when it "inquired as to [the defendant's] understanding of his waiver and its effects"). This is strong evidence that he in fact understood the appellate waiver.

Lawbaugh nonetheless argues that he suffers from Asperger's and, as a result, would have told Thornton and the court that he understood things out of a desire to appease them instead of out of honesty regarding his understanding of the appellate waiver. He points out that the court stated he "seem[ed] to be hesitant." (Doc. 81, 11:10-11.) But Lawbaugh explicitly testified, under oath, that he understood he was waiving his appellate rights. And, even after the court inquired as to why he was hesitating, he testified: "I went through [the plea agreement] with my attorney and he explained everything along the way pretty clearly." (*Id.* at 11:12-14.) Moreover, the court did not find Lawbaugh's testimony during the § 2255 hearing credible. His demeanor, contradiction with earlier statements made under oath, and failure to point out the parts of the appellate waiver he found confusing led the court to believe his newer testimony did not merit significant consideration. *See United States v.*

15

*McNeill*, 285 F. App'x 975, 981 (3d Cir. 2008) ("As we have stated, assessments of credibility by the trial court are entitled to great deference at the appellate level.") (internal quotations and brackets omitted).

Second, assuming Thornton's conduct was deficient, Lawbaugh failed to make a showing of prejudice. Lawbaugh explicitly testified that he would have signed the plea deal no matter what, including whether it had an appellate waiver or not. He stated that he "had no desire to abdicate responsibility or plead not guilty or anything so [he] signed the deal." He also stated that his "intention was always to plead guilty, and if that was the only deal that was being offered, [he] was going to sign it no matter what it" said, including whether it "had an appellate waiver or . . . a 25-year mandatory minimum or not." Absent a showing that, had he fully understood the appellate waiver, he would have gone to trial, he cannot show he suffered any prejudice. *Jackson*, 721 F. App'x at 134; *Fazio*, 795 F.3d at 426; *Hill*, 474 U.S. at 60.[4]

Indeed, Lawbaugh explicitly admitted he engaged in the conduct of which he is accused and that he therefore agreed to the plea deal for the sake of taking responsibility for his actions. He also benefitted from the dismissal of some claims

---

[4]  Lawbaugh also argues that his guilty plea was potentially ineffective because, when he originally read it, it listed his mandatory minimum as fifteen years, not twenty-five. This argument also fails due to Lawbaugh's testimony that he would have signed the plea agreement no matter what it said, and his argument that he does not want the plea agreement withdrawn.

16

and avoided defending himself at trial as a result of the plea deal. Having accepted the benefits of the plea deal, and having testified that he intends to keep them, Lawbaugh cannot now argue he wishes to be alleviated from its burdens. *Khattak*, 275 F.3d at 561 ("Allowing defendants to retract [appellate] waivers would prolong litigation, affording defendants the benefits of their [plea] agreements while shielding them from their self-imposed burdens.").

C. **Despite the Appellate Waiver Being Enforceable, Attorney Thornton's Failure to File a Notice of Appeal for Lawbaugh Entitles Lawbaugh to a Renewed Appellate Deadline.**

While the court has found Lawbaugh's appellate waiver enforceable, the United States Supreme Court has explicitly held that certain appellate rights are unwaivable; thus, even the broadest appellate waivers do not alleviate attorneys of their duty to file a notice of appeal if the client so requests.

The division of rights between criminal attorneys and their clients concerning appeals is clear. "[T]he accused has the ultimate authority to" decide "whether to . . . take an appeal," while counsel retains the right to select the arguments to be raised. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). It is well-established that "prejudice is presumed 'when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken.'" *Garza v. Idaho*, 139 S. Ct. 738, 744 (2019) (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000)). As such, the defendant need make no showing of "'the merits of his

17

underlying claims'" to prove prejudice, even if "the defendant has signed an appeal waiver." *Id.* at 742 (quoting *Roe*, 528 U.S. at 484). This is because "no appeal waiver serves as an absolute bar to all appellate claims." *Id.* at 744; *accord id.* at 747 (explaining that a defendant always "retain[s] a right to appeal at least some issues despite the waivers he signed").

If the client explicitly instructs counsel to file an appeal, they must do so. *United States v. Persaud*, No. 1:15-cr-236, 2017 WL 6405866, at *3 (M.D. Pa. Dec. 15, 2017) (citing *Roe*, 528 U.S. at 477). If the client does not explicitly request the filing of an appeal, however, the court must "conduct a 'circumstance-specific reasonableness inquiry.'" *Id.* (quoting *Battaglini v. United States*, 198 F. Supp. 3d 465, 472 (E.D. Pa. 2016)). "[C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal . . . or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Shedrick*, 493 F.3d at 301 (quoting *Roe*, 528 U.S. at 476-77). "[E]vidence that there were non-frivolous grounds for appeal or that the defendant at issue promptly expressed a desire to appeal will often be highly relevant." *Id.* at 301 (quoting *Roe*, 528 U.S. at 485). Defendants can also put counsel on notice of their intent to file an appeal by hotly contesting certain issues the court ends up deciding adversely. *See Persaud*, 2017 WL 6405866 at *3. If counsel was instructed, explicitly or implicitly, to file

18

an appeal, they satisfy this obligation by engaging in the "purely ministerial task" of filing a notice of appeal. *Garza*, 139 S. Ct. at 745 (quoting *Roe*, 528 U.S. at 474).

Separately, "the consultation itself can be deficient. The Supreme Court defined 'consulting' as 'advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to ***discover*** defendant's wishes.'" *Persaud*, 2017 WL 6405866 at *3 (quoting *Roe*, 528 U.S. at 478) (emphasis supplied). Failing to properly advise a client before they decide whether to appeal can itself be actionable ineffective assistance of counsel. *See id.*

Here, the parties vigorously contest whether Lawbaugh explicitly instructed Attorney Thornton to file an appeal or not. The court need not resolve this dispute, however, because Attorney Thornton should have inferred that Lawbaugh wanted an appeal filed from the following three facts examined together: (a) Lawbaugh informed Attorney Thornton that he wanted to file an appeal if he received a sentence exceeding the statutory minimum; (b) the court sentenced Lawbaugh to fifteen years more than the minimum; and (c) Lawbaugh's mother followed up with Attorney Thornton asking about the appeal ten days before the appellate deadline had run. In fact, Attorney Thornton testified that he understood Lawbaugh's mother to be communicating Lawbaugh's request for an appeal to him. The testimony of both Lawbaugh and his mother supports this reading. Yet Attorney Thornton both misadvised Lawbaugh's mother—by telling her Lawbaugh's appellate rights were

19

entirely waived—and failed to properly advise Lawbaugh by traveling to the facility where he was imprisoned and directly discussing the matter with him, advising him of the benefits and risks of filing an appeal.[5] As a result, Attorney Thornton deprived Lawbaugh of the right to file an appeal. Accordingly, the court will vacate Lawbaugh's sentence and re-enter it, restoring his appellate deadline to fourteen days from re-entry of his sentence.

## IV. CONCLUSION

For the reasons explained above, the court shall grant the motion in part, vacating Lawbaugh's sentence and re-entering it, granting him a renewed appellate deadline of fourteen days from re-entry of his sentence. The court shall deny the motion in all other regards. An appropriate order shall follow.

*/s/ Sylvia H. Rambo*
SYLVIA H. RAMBO
United States District Judge

Date: February 27, 2020

---

[5] The court understands Attorney Thornton advised Lawbaugh's mother before the *Garza* opinion came out because he was afraid that filing an appeal would risk the Third Circuit imposing sanctions on him. While the court is sympathetic to the gray area of law at the time Thornton was obligated to advise Lawbaugh, his conduct nonetheless constitutes sufficiently deficient counsel to justify reinstating Lawbaugh's appellate deadline.